# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Martin J. Walsh<br>Secretary of Labor<br>United States Department of Labor,<br><br>     Petitioner,<br><br>   v.<br><br>Stout Risius Ross, LLC<br><br>     Respondent. | No. 2-21-mc-00055-MMB |

## STATUS REPORT OF STOUT RISIUS ROSS, LLC

On August 20, 2021, the Court ordered Stout Risius Ross, LLC ("Stout") to produce certain documents, and suggested that it also produce a sample of other documents, all in response to Requests 1 and 2 of the administrative subpoena that the U.S. Department of Labor ("Department") issued to Stout ("Subpoena"). (*See* Dkt. 13). The Court's order instructed the Department to then assess whether Stout's productions are sufficient for the Department's purposes and directed the parties to submit a status report after holding a meet and confer. (*Id.*). After conferring, the parties were unable to agree on the adequacy of Stout's productions. Stout therefore submits the following status report, pursuant to the August 20 order, in lieu of a joint report with the Department.

**I. Background.**

The Department issued a three-tiered Subpoena to Stout on April 15, 2021. (*See* Subpoena, Dkt. 1-4). The first tier, Requests 1 and 2, seek valuation reports that Stout's ESOP Group[1] pre-

---

[1] The ESOP Group is the cohort of roughly twenty employees within Stout that performs the valuation work relevant to the Subpoena's requests. (*See* Response to Petition, Dkt. 4, at 6-7). As

pared in connection with transactions involving any benefits plan covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). (*Id.* at 9). The second tier is intertwined with the first: Request 3 seeks all documents—emails, client files, hard copy documents—that Stout generated in connection with each of the reports responsive to Requests 1 and 2.[2] (*Id.*). The Subpoena's final segment, found in the remaining twelve requests, seeks documents unrelated to Stout's client work, such as marketing materials (Requests 4-5), articles Stout authored (Requests 6, 8), and documents describing Stout's corporate structure (Requests 14-15). (*See id.* at 10-11).

The Department brought this action seeking to enforce Requests 1 and 2. More specifically, it brought the action seeking to compel Stout to produce the small remainder of documents response to Requests 1 and 2 that Stout had not already offered to turn over. (*See* Response to Petition, Dkt. 4, at 13-15 (summarizing the lead up to the Department's filing)). As Stout explained in its prior submissions, its ESOP Group tracks engagements in which Stout issues a valuation report alongside a type of opinion called a "fairness opinion." (*See id.* at 10, fn.3). Using this centralized tracking system, Stout estimated that it could identify roughly **95%** of all valuation reports responsive to Requests 1 and 2. (*Id.* at 10). Stout estimated that collecting the small remainder—which would require Stout to manually review its client files—would cost it hundreds of man-hours and hundreds of thousands of dollars. (*See id.* at 10-11). Though it would still be burdensome, Stout offered to produce the valuation reports issued alongside fairness opinions for a portion of the Subpoena's relevant time period. (*Id.* at 13-15). The Department indicated its refusal to accept

---

described in Stout's prior briefing, "ESOPs," or employee stock ownership plans, are a type of benefit plan that invests in employer stock. (*See generally id.* at 4-6).

[2] So far, Stout has produced 178 reports. (*See infra*). As it stands, the remainder of the Subpoena therefore seeks all of these other documents related to each of these 178 reports.

2

Stout's offer by filing this action. (*Id.* at 15).

II.     **Stout's productions and the parties' communications.**

Stout has made two document productions. Two days after the August 18 hearing, Stout produced the documents it had previously offered, and that the Department had previously refused: all valuation reports issued with fairness opinions that were responsive to Requests 1 and 2 and issued in 2018 and 2019. (August 20 Stout Letter, Golumbic Decl. Ex. J). Two weeks later, on September 3, Stout produced the same reports that it issued in 2020. (September 3 Stout Letter, Golumbic Decl. Ex. L). Although the Court did not order it to do so, Stout also produced a sampling of the small remainder of valuation reports that were not issued alongside fairness opinions and that Stout does not centrally track. (*Id.*).

The parties conferred via written correspondence, (*see* Golumbic Decl. Exs. J-M), and by phone on September 30 and October 12. During these meetings, the Department communicated (i) its view, without any supporting detail, that Stout's document productions to date are insufficient for the Department's needs, (ii) its demand that Stout produce all valuation reports for a fourth year, 2021, and (iii) its desire to depose one or more Stout employees over the next sixty (60) days to determine whether the burden of collecting the small remainder of valuation reports that Stout does not centrally track—a burden that Stout has already described in detail via letters, phone calls, briefing, and a sworn statement—is unreasonable. (*See* October 12 Stout Email, Golumbic Decl. Ex. M). Stout's counsel explained why Stout's productions already satisfy the Department's stated needs and why deposing multiple Stout employees would be unreasonable. (*See id.*). Stout's view is set forth below.

III.    **The Department has all of the information it needs to meet the needs of its investigation.**

The Department issued the Subpoena to, as the Department put it, "determine how [Stout]

3

conducts valuations in connection with transactions where an ERISA-covered plan purchases or sells the equity interest of the business sponsoring the plan, and what factors it considers and applies in doing so." (May 25 DOL Letter, Dkt. 4-5, at 2).

Stout's productions contained *15,507 pages* of material in response to the Subpoena. (September 3 Stout Letter, Golumbic Decl. Ex. L). They include *178 valuation reports* that Stout issued in 2018, 2019, and 2020. (*Id.*). Each of these valuation reports contain lengthy, detailed explanations of Stout's assumptions, methods, analyses, and conclusions for each specific valuation engagement. And they display Stout's processes and approaches to valuing a diverse array of businesses across a multitude of industries and involving various transaction structures. For example, the produced reports value everything from pet care providers in the Southeast to manufacturing companies in the Midwest; include companies valued around $20 million to those valued for hundreds of millions of dollars; and are issued in connection with transactions structured every which way, from purchases of 100% interests to partial interests, and from fully- to partially-seller financed deals (to name just a few examples). (Golumbic Decl. ¶ 3). In all, the 178 reports cover nearly *80 different businesses* and their respective benefits plans that participated in the deals. (*Id.*) In other words, the 178 valuation reports that Stout has produced contain all the information the Department needs to "determine how [Stout] conducts valuations . . . and what factors it considers and applies in doing so."

Notably, the Department possesses reams of other documents that also provide insight into Stout's valuation methods. In the last three years alone, Stout estimates that it has produced roughly *100 other valuation reports* and *20,000 other documents*—including emails, workpapers, client files, and hard copy documents—to the Department in response to *at least 20 other subpoenas*. (*See* Response to Petition, Dkt. 4, at 18). In the last ten years, Stout (conservatively) estimates

that it has produced to the Department more than ***200 other valuations*** in connection with the Department's other investigations and enforcement actions. (*Id.* at 18-19). Beyond documents, the Department has also collected at least ***120 hours*** of direct, in-person statements from Stout regarding its valuation practices via investigation interviews, depositions, and trial testimony. (*Id.* at 19).

By any reasonable measure, then, the Department now has more than enough information to "determine how [Stout] conducts valuations."

## IV. The Department's new demands represent an unreasonable step backwards in the process.

Nevertheless, the Department's appetite for collecting more information—and imposing additional burdens on Stout—remains insatiable. Though it has only conducted a preliminary review of the 15,000-plus pages Stout has produced, the Department has already concluded, without any explanation whatsoever, that the production does not meet its needs. (*See* October 12 Stout Email, Golumbic Decl. Ex. M). The Department now makes two demands: that Stout produce all valuation reports from 2021, and that Stout sit for one or more Rule 30(b)(6) styled depositions so that the Department can determine whether the burden that Stout has articulated of collecting the small remainder of valuation reports that are not centrally tracked is accurate.[3] (*See* October 12 Stout Email, Golumbic Decl. Ex. M). These new demands are nonsensical.

**Documents.** The Department has not explained why it needs more documents to meet its stated goal: to understand how Stout conducts valuations. What is lacking from the hundreds of valuation reports that Stout has already provided that the Department believes it will find in the reports issued in 2021? Why does the Department believe the remaining reports will contain this

---

[3] The Department has proposed a process by which it would send Stout a proposed list of topics to be covered at the depositions, which the parties would then presumably negotiate over the topics themselves and the scope of each. (*See* October 12 Stout Email, Golumbic Decl. Ex. M).

lacking information? How did the Department weigh its need for this information against Stout's substantial burden to conclude that Stout *must* produce every scrap of paper it has? In short, what is the value-add of all this additional material that justifies imposing additional burdens on Stout?

The Department provides no answers to these or other relevant questions because no good answers exist. It bears repeating: the Department wants this Court to force Stout to produce documents that would impose substantial hardship on Stout's ESOP Group without advancing the Department's stated purpose. This is improper—the Department must demonstrate a nexus between its purpose and the information it seeks. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964) (holding that investigations must be "conducted pursuant to a legitimate purpose" and may involve only "inquir[ies] . . . relevant to the purpose").

While the benefit to the Department is nonexistent, the burden to Stout is not. As explained above and in Stout's original filings, Stout keeps a record of engagements in which it issues valuations alongside fairness opinions—the vast majority of its engagements. But locating, reviewing, and producing these valuations plus fairness opinions, while simpler than doing so for the small remainder not issued with fairness opinions, is still a process that takes significant time and diverts the ESOP Group's employees from their day-to-day work. To identify the small remainder of 2021 valuations that are not centrally tracked would be extremely costly, as Stout has explained. (*See* El-Tahch Decl., Dkt. 4-11, ¶¶ 16-18 (explaining process for responding to Requests 1 and 2 in full, including the remainder valuations not issued with fairness opinions)).

**Depositions.** It would be pointless for Stout to sit for Rule 30(b)(6)-style depositions regarding Stout's file storage and burden of producing the small remainder of valuation reports not already produced (*i.e.*, those not issued alongside fairness opinions). There is no testimony that Stout could provide that would appease the Department or resolve any outstanding issue.

For example, if the Department deposes Stout and concludes that Stout's actual burden is *less than* the burden Stout described—a likely result, given that the Department has already implied it does not believe Stout, (*see* Department's Reply, Dkt. 10, at 4 ("The Secretary believes [Stout's] estimates to be overinflated and otherwise deficient."))—then the Department will no doubt ask the Court to force Stout to produce the material. And we already know the Department's position if it concludes that Stout's actual burden *matches* the burden Stout described. The Department has represented to this Court its view that the burden Stout articulated is not unreasonable in light of the Department's needs. (*See* Petition, Dkt. 1-1, at 15 ("But even assuming *arguendo* that [Stout]'s projections of man hours are correct, . . . [Stout]'s claimed production burden would be warranted given its extensive involvement in the highly regulated employee benefit plan industry.")). Consequently, the Department will continue to press for Stout to produce every scrap of paper no matter Stout's testimony.

While the proposed depositions bring no benefits, they do bring substantial costs—and Stout would bear the brunt of them. It would need to spend more of its resources and employees' time negotiating a topics list, conducting employee interviews to prepare one or more corporate representative for depositions, sitting for depositions, opposing the Department's subsequent motions to compel, and appearing for hearings on those motions—all while the full weight of the Subpoena's fifteen requests continues to hang over its head. These preparation costs, including outside counsel expenses, could easily run into the low six figures.

Attempting to foist these costs on Stout for no benefit whatsoever is an abuse of the Department's power to conduct investigations and issue administrative subpoena. *See Powell*, 379 U.S. 58 ("Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any

other purpose reflecting on the good faith of the particular investigation."). The Court should not allow it. Because "[i]t is the court's process which is invoked to enforce the administrative summons," the "court may not permit its process to be abused." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 124 (3d Cir. 1981) (citing *Powell*, 379 U.S. at 58); *see FCC v. Cohn*, 154 F. Supp. 899, 908 (S.D.N.Y. 1957) ("Of course the subpoena power must at all times be confined to 'the rudimentary principles of justice,' and the courts will plainly refuse to enforce an administrative subpoena which is not within the bounds of reasonableness."). And as the Third Circuit "has emphasized," federal courts "have never lent their enforcement machinery to an executive branch investigative body in the manner of a rubber stamp." *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 124.

Ultimately, the Department asks the Court to backtrack procedurally. Before this action was filed, Stout spelled out for the Department its anticipated burden and the manner in which Stout calculated it.[4] When the Department filed suit, Stout submitted a sworn declaration containing these same explanations.[5] The Court reviewed this declaration and issued its August 20 order instructing the Department to accept and review the productions Stout had proposed and that the

---

[4] For example, Stout first explained its burden in collecting the small remainder of reports on June 8, 2021. (*See* June 8 Stout Letter, Dkt. 4-6 at 3-4). And Stout explained in detail—at the Department's request, and after a week's worth of troubleshooting by Stout's IT team—Stout's file storage systems and the reasons why obtaining the remainder reports would be extremely difficult and costly. (*See* El-Tahch Decl., Dkt. 4-11, ¶¶ 19-23; July 23 Stout Letter, Dkt. 4-9, at 1-2).

[5] See Stout's Response to Petition, Dkt. 4, at 9-13, summarizing Mr. El-Tahch's declaration. (*See also* El-Tahch Decl., Dkt. 4-11, ¶¶ 16-18 (calculating that responding to Requests 1 and 2 in full would cost Stout up to 515 man-hours and $257,500); ¶¶ 19-23 (explaining the process Stout's IT team took to determine whether it could run searches in lieu of a costly manual review); ¶¶ 24-28 (extrapolating from experience responding to other Department subpoenas related to a single client, estimating that responding to the Subpoena in full would cost roughly 4,000 man-hours and $6 million)).

Department had previously rejected, and establishing a meet and confer process over the documents Stout provided. (Dkt. 13).

The Department now wants a "do over." It essentially argues that Stout's sworn declaration is insufficient, and asks the Court to send the parties back to their pre-suit discussions regarding burden. But that is not the law. Courts routinely rely on party affidavits to decide discovery disputes. *E.g.*, *Caver v. City of Trenton*, 192 F.R.D. 154, 164 (D.N.J. 2000) (denying motion to compel documents because "[t]he Court is persuaded by the Affidavit of James Norton"). Indeed, courts often dismiss burden arguments when they ***are not*** supported by an affidavit. *E.g.*, *Welker v. SmithKline Beckman*, No. 89-cv-866, 1989 WL 121894, at *2 (E.D. Pa. Oct. 12, 1989) (rejecting defendant's "[m]ere unsubstantiated allegations of . . . undue burden" where defendant "fail[ed] to proffer any evidence, by way of affidavit or otherwise, to justify denying plaintiff's requested discovery."). The Department knows this—it supported its Petition with an affidavit of its own. (*See* S. Gharanfoli Decl., Dkt. 1-2).

The Court should not allow the Department to walk back the process the Court set in motion. However, should the Court find that discovery is appropriate, Stout respectfully requests that the Court grant it the same discovery—to take one or more depositions probing the accuracy of the representations the Department has made to the Court in support of its Petition and related filings.

## V. The Court should order the parties to proceed with the compromise proposal described in Stout's Motion to Modify.

The Department's recent tactics are emblematic of its positions in the six months since it issued the Subpoena: make unreasonable demands, refuse any and all reasonable compromises, and hold the threat of imposing future burdens over Stout for as long as possible.

Stout's ESOP Group needs a resolution to this matter. Stout has estimated that responding

9

to the Subpoena in full—that is, identifying, collecting, reviewing, and producing all documents related to the work it performed in connection with the 178 valuation reports—would require Stout's ESOP Group to divert roughly 4,000 man-hours from its normal business practices at a cost of roughly $6 million dollars. (*See* Response to Petition, Dkt. 4, at 17). The uncertainty of whether the ESOP Group will be required to shoulder this heavy burden is an albatross around its neck. Without knowing its production obligations, it is nearly impossible for the ESOP Group to make basic decisions about how to allocate its limited group resources—for example, it cannot forecast whether it has the capacity to take on additional engagements, decide whether it can or should hire additional employees, determine how best to allocate work among its current members, or establish and communicate to its clients accurate timelines for completing valuation assignments, among many other disruptions.

Given that the parties are at an impasse over Stout's productions in response to Requests 1 and 2 and the reasonableness of the Subpoena's remaining requests, the time is ripe for the Court to decide Stout's Motion to Modify, (Dkt. 5), which asked the Court to resolve the parties' dispute by imposing the following reasonable compromise:

> **1.     Stout will produce all valuation reports associated with ESOP stock purchase or sale transactions in which it also offered a fairness opinion where the company's enterprise value exceeded $20 million between January 1, 2018, and December 31, 2020, within 30 days of the date of the Court's order. . . .**
>
> **2.     From this production, EBSA will select up to three clients to whom Stout provided valuations, and Stout will produce non-privileged documents responsive to Request 3 and its subparts for those client engagements. . . .**
>
> **3.     Requests 4 through 15 will be stricken.**

(Dkt. 5-1, at 6-7). Stout respectfully renews its request that the Court order the relief requested in the Motion to Modify.

Dated: October 15, 2021    **GROOM LAW GROUP, CHTD.**

<u>*/s/ Lars C. Golumbic*</u>
Lars C. Golumbic (*pro hac vice*)
William J. Delany (PA 74864)
Andrew D. Salek-Raham (*pro hac vice*)
1701 Pennsylvania Ave., NW, Suite 1200
Washington, D.C. 20006
lgolumbic@groom.com
wdelany@groom.com
asalek-raham@groom.com
T: 202-857-0620
F: 202-659-4503

*Counsel for Stout Risius Ross, LLC*

## **CERTIFICATE OF SERVICE**

I certify that on this 15th day of October 2021, the foregoing STATUS REPORT OF STOUT RISIUS ROSS, LLC was served on all counsel of record via the court's electronic filing system.

Respectfully submitted,

<u>*/s/ Lars C. Golumbic*</u>
Lars C. Golumbic